**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WALDMAN SEAFOOD, INC., | : | Civil Action No. 2:12-cv-02054-SDW-MCA |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| MICAL SEAFOOD, INC. | : | **June 24, 2014** |
| Defendant. | : | |
| MICAL SEAFODD, INC., | : | |
| Counterclaim Plaintiff, | : | |
| and | : | |
| RICARDO TORRES, | : | |
| Intervenor, | : | |
| v. | : | |
| WALDMAN SEAFOOD, INC., | : | |
| Counterclaim Defendant, and | : | |
| DAN WALDMAN, | : | |
| Third-Party Defendant. | : | |

**WIGENTON**, District Judge.

     Before this Court is Plaintiff/Counterclaim Defendant Waldman Seafood, Inc. ("Waldman Seafood") and Third-Party Defendant Dan Waldman's ("Waldman") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c). Also before this Court is Defendant and Counterclaim Plaintiff MiCal Seafood, Inc.'s ("MiCal") Motion to Dismiss the Complaint. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b). This

court, having considered the parties' submissions, decides this matter without oral argument pursuant to Fed. R. of Civ. Pro. 78.  For the reasons stated below, Waldman and Waldman Seafood's motion is **GRANTED**.  Mical's motion to dismiss is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Parties

Waldman Seafood is a New Jersey corporation with its principal place of business in Englewood, New Jersey. (Compl. ¶ 1.)  Third-Party Defendant Waldman is an employee of Waldman Seafood and a citizen of New Jersey.  (Dkt. No. 7, Answer to Counterclaim and Third-Party Claims ("Ans. to Countercl.") ¶¶ 3, 4.)  Waldman Seafood is in the business of buying seafood from fish resellers.  (Pl.'s & Third-Party Def.'s Br. ("Pl. Br.") 1.)

MiCal is a Florida corporation with a principal place of business in Florida.  (Ans. to Countercl. ¶ 1.)  Intervenor Ricardo Torres ("Torres") is the president of MiCal and is a citizen of Florida.  (Ans. to Countercl.¶ 2.)  MiCal is in the business of wholesale importation and sale of seafood products.  (Ans. to Countercl. ¶¶ 1, 2.)

### B.  Factual Background

On or about February 7, 2012, Waldman Seafood's personnel distributed an e-mail to numerous companies in the fish sales industry inquiring about the availability of fish products for sale, including tuna.  (Pl. & Third-Party Def.'s Statement of Undisputed Material Facts ("SUF") ¶ 1.)  Over the next few days, Waldman Seafood personnel and Marc Ruben ("Ruben"), an independent contractor who is authorized to trade seafood on MiCal's behalf, engaged in discussions regarding the sale of certain types of tuna.  (*Id*. ¶¶ 2-9.)  Ruben and Waldman Seafood personnel were unable to reach an agreement on prices.  (*Id*. ¶¶ 4-9.)  Thereafter on February 9 at 4:40 p.m., Ruben sent a "blast" e-mail to Waldman Seafood and other MiCal customers advising

them that MiCal was "taking pre-orders" on a specific parcel of tuna product; the blast email included a description of the tuna, its volume and prices. (*Id*. ¶ 10.)  Waldman responded at 4:44 p.m. via an e-mail stating:

> i will take it all
> po 125151
> thanks
> dan

(*Id*. ¶ 11.)  Minutes later, Ruben responded to Waldman's e-mail at 4:59 p.m. stating: "Done, thank you, Marc" (*Id*. ¶ 12.)  Waldman then responded to Ruben, as well as copying Jay Molbogot ("Molbogot"), Vice President of MiCal, and Torres, stating:

> thank you
> please send me the pics when you have them taken at the freezer
>
> thanks
> dan

(*See* Def.'s Ex. A.)

>     After the e-mail exchange between Ruben and Waldman, Molbogot sent an e-mail to Ruben, in which Waldman and Torres were copied, revealing that Molbogot had already sold the subject tuna to other customers but would nevertheless allocate some of the tuna to Waldman. (*Id*.)  Molbogot's e-mail also advised that they could discuss the matter the following morning. (*Id*.)  The next morning, Waldman e-mailed MiCal employees inquiring about the status of his order as he had resold a portion of the subject tuna to Waldman Seafood customer Port Royale Trading Company, Inc. ("Port Royale")[1] in a back to back sale.  (SUF ¶ 19.)  Waldman and Torres

---

[1] At various times, both parties identify the Waldman Seafood customer as "Port Royale" and "Port Royal."  In a certification submitted by an employee of the company, however, he identifies it as "Port Royale."  *See* Exhibit J to Declaration of Merrill O'Brien, Certification of Richard Nichols (July 26, 2012).  As such, this Court will use the moniker "Port Royale."

then engaged in a series of e-mails in which Torres advised Waldman that none of the tuna was then available for sale to Waldman Seafood and that Waldman should give Torres a call.  (*See* Def.'s Ex. A.)  Waldman and Torres then had a telephone conversation in which Torres stated that MiCal could not supply Waldman Seafood with any tuna until further notice.  (*See* Def.'s Ex. D, Intervenor Ricardo Torres Deposition at 56:6–57:10 (Feb. 21, 2013).)  This conversation was followed by Waldman, Torres and Molbogot exchanging expletive-laden e-mails.  (Def.'s Ex. A.)  In several e-mails, Waldman complained that Torres was a "snake" and claimed that he had sent the e-mail stream to numerous other MiCal customers.  (*Id.*).

It is undisputed that Waldman Seafood did not receive any of the subject tuna from MiCal. (SUF ¶¶ 14-15; Def.'s Counter Statement of Material Facts ("CSUF") ¶¶ 17-19.)  As a result, Waldman Seafood lost $34,900 in profits on the portion of tuna it had contracted to resell to Port Royale, and it lost $36,030 on the remainder, for a total of $70,930.00 in lost profits.  (SUF ¶¶ 19-20.)

### C.  Procedural History

On or about February 22, 2012, Waldman Seafood filed a one-count Complaint in the Superior Court of New Jersey, Law Division, Bergen County alleging breach of contract against MiCal.  (Dkt. No. 1.)  On or about April 5, 2012, MiCal removed this matter to the District Court for the District of New Jersey.  (*Id.*)  On or about May 7, 2012, MiCal, as counterclaimant, and Torres, as an intervenor, filed their counterclaims and third-party claims alleging defamation, tortious interference, invasion of privacy, and breach of contract/account stated claims against Waldman Seafood and third-party defendant Waldman.  (Dkt. No. 5.)  On or about November 22, 2013, MiCal filed a motion to dismiss plaintiff's complaint with prejudice arguing that such relief was warranted based upon Waldman Seafood's spoliation of evidence.  (Dkt. No. 63.)  On or about

December 16, 2013, Waldman Seafood and Waldman filed the instant motion for summary judgment based on the existence of a contract and MiCal's subsequent breach thereof.  (Dkt. No. 70.)

## II.    LEGAL STANDARD

Summary Judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must show that if the evidentiary material of record was reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue of material fact for trial, and may not rest upon the mere allegations or denials of its pleadings.  *See Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).  The court may not weigh the evidence and determine the truth of the matter, but rather should determine whether there is a genuine issue as to a material fact.  *See Anderson*, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in "a light most favorable" to the nonmoving party.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991).  The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325)).  If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to

5

which [it] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## III.   DISCUSSION

### A.   Waldman Seafood and Waldman's Summary Judgment Motion

#### 1.   Waldman Seafood's Breach of Contract Claim

Waldman Seafood argues that the undisputed evidence shows that MiCal breached the contract by failing to furnish the agreed upon tuna.  "At the most basic level, a contract consists of an offer, acceptance and consideration."  *Corestar Int'l PTE. Ltd. v. LPB Commc'ns., Inc.*, 513 F. Supp. 2d 107, 116 (D.N.J. 2007).  Under New Jersey law, the Uniform Commercial Code ("UCC") governs transactions between merchants for the sale of goods.  *N.J.S.A.* 12A:1-101, *et seq*.  The UCC is "a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods."  *Spring Motors Distribs. v. Ford Motor Co.*, 98 N.J. 555, 565 (1985).  Under the UCC, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognize the existence of such a contract."  *N.J.S.A.* 12A:2-204(1).  It further provides that "[u]nless otherwise unambiguously indicated . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."  *N.J.S.A.* 12A:2-206(1)(a).

Here, the evidence indisputably shows that MiCal made an offer to sell a specific type of tuna; Waldman Seafood accepted MiCal's offer; and MiCal breached the contract by its failure to furnish the specified tuna.  Indeed, at 4:40 p.m., Ruben sent a blast e-mail to MiCal's customers, including Waldman Seafood, announcing that MiCal had certain types of tuna for sale, which MiCal expected to receive Food and Drug Administration clearance the following day.  (SUF ¶ 10.)  Promptly thereafter at 4:44 p.m., Waldman responded that Waldman Seafood would take it

6

all the tuna and included a purchase order number in the responsive e-mail.  (*Id.* at ¶ 11.)  At 4:59

p.m., Ruben responded to Waldman's e-mail with the following: "Done, thank you, Marc."  (*Id.*

at ¶ 12.)  As such, a valid, binding contract was created between Waldman Seafood and MiCal.

*See Promotion in Motion, Inc. v. Beech-Nut Nutrition Corp.*, 2011 U.S. Dist. LEXIS 145953, *6-

7 (D.N.J. Dec. 20, 2011), *aff'd* 548 Fed. Appx. 47, 49 (3d Cir. 2013) (holding as a matter of law

that purchase orders may be binding contracts).

　　　　Importantly, MiCal does not dispute the sequence of events.  Rather, MiCal argues that

when Waldman replied to Ruben's confirmatory e-mail asking that pictures of the tuna be sent to

him after the pictures were "taken at the freezer," a condition precedent was created that

conditioned the sale on Waldman Seafood viewing the pictures, and presumably accepting the

quality of the tuna.  (Def.'s Br. 5.)  MiCal asserts that this condition precedent created ambiguity

in the contract because it "leave[s] the agreement open to further negotiation after the buyer views

the pictures because he can insist the pictured product is not up to his subjective standard – giving

him leverage to demand a better price or totally reject the goods."  (*Id.*)  MiCal's position is wholly

without merit.

　　　　"A condition precedent is a fact or event occurring subsequently to the making of a valid

contract which must exist or occur before there is a right to immediate performance, before there

is a breach of contract duty or before the usual judicial remedies are available."  *Video Pipeline,

Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 562 (D.N.J. 2002) (quoting *Suburban

Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 224-25 (3d Cir. 1983)).  Under the

UCC, a condition precedent is created in acceptance only when acceptance is "*expressly* made

conditional on assent to the additional or different terms."  *N.J.S.A.* 12A:2-207(1) (emphasis

supplied).  While there are not any magic words that create a condition precedent, the condition

7

must clearly be expressed and courts have historically read terms similar to "on the condition that," "provided, however" as creating condition precedents. *Suburban Transfer Serv.*, 716 F.2d at 224; *Hill v Commerce Bancorp*, 2010 U.S. Dist. LEXIS 59988, *15 (D.N.J. June 17, 2010). It would defy logic to find that Waldman's request for pictures created a condition precedent. Waldman's request for pictures came *after* Waldman Seafood had already accepted MiCal's offer to sell the tuna and *after* Ruben's e-mail acknowledging that Waldman Seafood had accepted MiCal's offer. Stated differently, Waldman's request for pictures came after the creation of a valid, binding contract. Nowhere in the e-mail from Waldman requesting pictures can one reasonably conclude that Waldman Seafood expressly conditioned its acceptance of MiCal's offer on Waldman Seafood receiving pictures of the tuna and approving the images contained therein.

Ironically, MiCal tacitly concedes that a condition precedent was not created by Waldman's e-mail requesting pictures. Molgobot, whom MiCal also designated as its expert, submitted a certification in which he states as follows: "In the seafood industry, when [acceptance is] 'subject to' pictures, there is no agreement until the buyer accepts the pictures because the grade, i.e. AAA or AA, is completely subjective." (Def.'s Ex. B, Certification of Jay Molgobot ¶ 7.) By MiCal's own admission, a condition precedent is created when the buyer accepts the offer "subject to" pictures. Here, Waldman Seafood accepted MiCal's offer without subjecting it to any conditions. Subsequent to Waldman Seafood's acceptance of MiCal's offer – and subsequent to MiCal acknowledging that Waldman Seafood had accepted its offer – Waldman Seafood then requested pictures of the tuna. Therefore, Waldman Seafood accepted MiCal's offer without subjecting its acceptance to any conditions.

MiCal's affirmative defenses are equaling unavailing. It asserts fourteen affirmative defenses sounding in, *inter alia*, failure to mitigate damages, want of consideration, impossibility,

8

and unilateral mistake.  MiCal contends that Waldman Seafood failed to mitigate its damages when, after MiCal informed Waldman Seafood that it would not sell Waldman Seafood the entire amount of agreed upon tuna, Waldman Seafood rejected MiCal's offer to furnish a portion of the subject tuna.  (Def.'s Br. 5-6.)  While it is well-settled under New Jersey law that the non-breaching party must take reasonable steps to mitigate his damages, the burden is on the breaching party to prove that the non-breaching party failed to have done so.  *Am. Seating Co. v. Archer Plastics Inc.*, 2012 U.S. Dist. LEXIS 99594, *26 (D.N.J. July 18, 2012) (quoting *Ingraham v. Trowbridge Builders*, 297 N.J. Super. 72, 83 (App. Div. 1997)); *Grubbs v. Knoll*, 376 N.J. Super. 420, 436-37 (App. Div. 2005).  Where there is no evidence of the non-breaching party's unreasonable failure to mitigate damages, the court may decide the issue on summary judgment.  *Am. Seating Co.*, 2012 U.S. Dist. LEXIS at *27; *Sempra Energy Solutions, LLC v. Exec. Campus, LLC*, 2012 U.S. Dist. LEXIS 18838, *14-15 (D.N.J. Feb. 15, 2012).

MiCal advances several pieces of evidence in arguing that Waldman Seafood failed to mitigate damages.  First, MiCal points to a February 9, 2012 e-mail from Molbogot to Waldman wherein Molbogot informs Waldman that although the subject tuna was committed to another customer, Molbogot would allocate some of the tuna to Waldman Seafood.  (Def.'s Ex. A.)  Second, MiCal points to a conversation Torres and Waldman had on the morning of February 10 in which Torres informed Waldman that he was not in a position to provide Waldman Seafood with any of the subject tuna because Torres was not certain how much of the tuna was committed to another customer.  (*See* Def.'s Ex. D, Intervenor Ricardo Torres Deposition at 56:6–57:10 (Feb. 21, 2013) ("Torres Dep.").)  Contrary to MiCal's contentions, however, the evidence of record shows that MiCal cannot sustain its burden of proving that Waldman Seafood unreasonably failed to mitigate its damages.  On the morning of February 10, Waldman inquired as to the contract's

status and advised that he had already resold the subject tuna on a back-to-back sale. (Def.'s Ex. A.; Pl.'s Ex. A.) Torres responded that the "product was committed" and that he was sorry for the mistake. (Pl.'s Ex. A.) Waldman replied asking how much of the subject tuna he would receive to "save face" with his customer. (*Id.*) Torres advised Waldman that MiCal could provide "none" at the moment and instructed Waldman to call him. (*Id.*) Waldman then implored Torres to furnish "at least half" so Waldman Seafood could "save face with [its] customer." (*Id.*) In the follow-up phone conversation, Torres confirmed that MiCal was not in a position to provide Waldman Seafood with any tuna pending input from Molbogot.[2] (*See* Def.'s Ex. D, Torres Dep. at 57:3-10.) Thereafter, the business relationship terminated with mutual assurances that MiCal and Waldman Seafood would never conduct business with each other again. (*See* Pl.'s Ex. A.) Accordingly, MiCal's position that Waldman Seafood unreasonably failed to mitigate its damages lacks evidentiary support. Waldman made several attempts to purchase some portion of the subject tuna from MiCal and beseeched MiCal to furnish at least half so Waldman could save face with its customer. As such, MiCal's argument that Waldman Seafood unreasonably failed to mitigate its damages is unavailing. Finally, with respect to MiCal's remaining affirmative defenses, this Court has considered them and concludes that they are without merit.

In sum, it is beyond dispute that Waldman Seafood and MiCal entered into a binding contract and that MiCal breached the contract. Therefore, Waldman Seafood's motion for summary judgment on its breach of contract claim is granted.

### 2.   MiCal's Counterclaims

MiCal and/or Torres, as an intervening party, assert four counterclaims sounding in defamation, tortious inference with business relationships, invasion of privacy, and account

---

[2] It should be noted that during deposition, Molbogot testified that although approximately 40% of the subject tuna was unallocated, MiCal would not have sold the entire unallocated portion to Waldman Seafood.

stated/breach of contract against Waldman Seafood and/or Waldman, individually.  (Dkt. No. 5.)
Based on the evidence of record, their counterclaims are not sustainable.

a.      Invasion of Privacy Counterclaim

Torres alleges that Waldman's publication of the e-mail exchange in which Waldman
referred to Torres as a "snake" "invaded Mr. Torres's privacy because it exposed him in a false
light to third parties and because it exposed his private affairs to third parties who had no legitimate
interest in learning of the affairs and who, as reasonable third parties, would find the matter
offensive."  (Dkt. No. 5, Answer and Counterclaim ¶ 28.)  Torres alleges that "[a]s a proximate
result of the . . . publication, [he] has suffered loss of reputation, shame, mortification, and injury,
all to his damage."  (*Id.* ¶ 32.)  In opposition to the summary judgment motion, Torres argues that
Waldman falsely accused him of being a snake and then published the falsehood to an unknown
number of merchants in the seafood industry, which caused great harm to Torres.  (Def.'s Br. 7.)
Notably, Torres does not cite to any evidence to prove his counterclaim but simply makes
unsupported arguments.  (*Id.*)

Under New Jersey law, "a cause of action exists for invasions of privacy involving
'publicity that unreasonably places the other in a false light before the public.'"  *Romaine v.
Kallinge*r, 109 N.J. 282, 293-96 (1988) (citations omitted).  In order to prove false light, the
claimant must show the following two elements: "'(1) the false light in which the other was placed
would be highly offensive to a reasonable person'; and (2) 'the actor had knowledge of or acted in
reckless disregard as to the falsity of the publicized matter and the false light in which the other
would be placed.'"  *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 589 (2009) (citation omitted).
As is evident from the tort's elements, "a fundamental requirement of the false light tort is that the
disputed publicity be in fact false, or else 'at least have the capacity to give rise to a false public

impression as to the plaintiff.'" *Romaine*, 109 N.J. at 294 (citation omitted).  In analyzing the alleged commission of the false light tort, the court's first duty is to determine whether the objectionable matter is highly offensive to a reasonable person.  *Id*. at 295.  "In making this determination, the court 'should not consider words or elements in isolation, but should view them in the context of the whole article to determine if they constitute an invasion of privacy.'"  *Id*. When the entire context of the Waldman/Torres exchange is examined, it becomes apparent that Torres cannot satisfy the false light elements.  As a threshold matter, a reasonable person would not consider Waldman's "snake" comments highly offensive.  Indeed, the undisputed evidence shows that Waldman forwarded the e-mail string containing the snake comments to its customer, Port Royale, to further explain why Waldman Seafood was unable to fulfill its contractual duties to Port Royale after Port Royale inquired as to why MiCal had refused to furnish the subject tuna to Waldman Seafood.  (*See* Exhibit J to Declaration of Merrill O'Brien, Certification of Richard Nichols ¶¶ 3-6 (July 26, 2012) ("Nichols Cert.").)  As such, a reasonable person would understand the snake comments were in reference to Torres and MiCal's failure to abide by their contract with Waldman Seafood, which resulted in Waldman Seafood failing to abide by its contract with Port Royale.  In fact, Port Royale has confirmed that the allegedly tortious comments did not affect Port Royale's willingness to continue to do business with MiCal.  (*Id*.)  Accordingly, a reasonable person would not find Waldman's snake comments highly offensive, and Waldman's summary judgment motion with respect to the false light counterclaim is granted.

b.      Remaining Counterclaims

MiCal and Torres's remaining counterclaims sound in defamation, tortious inference with business relationships, and account stated/breach of contract.  In opposition to Waldman and Waldman Seafood's summary judgment, MiCal and Torres did not advance any evidence that

support these counterclaims.  In fact, MiCal and Torres do not even address these counterclaims in their opposition brief.  (*See generally*, Def.'s Opp. Br.)  As such, these counterclaims warrant little comment.

Under New Jersey law, in order to state a cause of action for defamation, the plaintiff must prove: "(1) that the defendant made a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) fault." *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998).  "A defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Romaine*, 109 N.J. at 289.  A threshold issue that must be decided by the court is "whether the statement at issue is reasonably susceptible of a defamatory meaning." *Id*. at 290.  In making this determination, the court must look to the "fair and natural meaning which will be given it by reasonable persons of ordinary intelligence" and examine the publication as a whole in the context used.  *Id.*

Similar to the analysis *supra*, a reasonable person would not consider Waldman's "snake" comments as defamatory and would not ascribe a defamatory meaning to the comments.  The evidence of record shows that the allegedly defamatory comments were published to only one recipient, who confirms that the publication did not result in him viewing MiCal or Torres with hatred, contempt or ridicule as evidenced by his continued willingness to conduct business with MiCal.  Furthermore, the term "snake" is colloquially used to refer to an untrustworthy or deceptive person.  A reasonable person would understand how Waldman reached that opinion of Torres based on the comments' context.  *See Ward v. Zelikovsky*, 136 N.J. 516, 529-31 (1994) (stating statements of opinion and name-calling are not defamatory).  Accordingly, Waldman and

13

Waldman Seafood's summary judgment motion is granted on MiCal and Torres's defamation claim.

Next, a plaintiff can establish a tortious interference with business relationships cause of action by showing the following elements: (1) they had some reasonable expectation of economic advantage; (2) the defendants' actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) the interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit, and (4) the injury caused the plaintiff damage. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751-52 (1989).

The tortious interference counterclaim rests solely on Waldman's distribution of the e-mail string wherein he makes the snake comments. There is simply no evidence, however, that MiCal lost any business or was otherwise harmed by Waldman's distribution of the e-mail string. As repeatedly reiterated *supra*, the only MiCal customer that received the e-mail string remains committed to conducting business with MiCal. In short, MiCal has fallen woefully short of advancing enough evidence to show that it can establish its tortious interference counterclaim at trial. Accordingly, Waldman and Waldman Seafood's summary judgment motion is granted on the tortious interference counterclaim.

Finally, MiCal has failed to produce any evidence in opposition to the instant summary judgment motion that supports its accounted stated/breach of contract counterclaim. MiCal did not advance any evidence demonstrating that Waldman Seafood breached a contract with it or that Waldman Seafood is in arrears to it. Therefore, Waldman's Seafood summary judgment motion is granted.

**B.     MiCal's Motion to Dismiss**

MiCal's motion to dismiss is rooted in its position that Waldman Seafood is guilty of spoliation of evidence by Waldman Seafood's failure to produce telephone and/or e-mail records evidencing Waldman's communications with Port Royale.  (Def.'s Br. 1-6.)  MiCal argues that Waldman Seafood's breach of contract claim should be dismissed because a substantial part of Waldman Seafood's damages are the loss profits it allegedly suffered on the back-to-back sale of a portion of the subject tuna to Port Royale.  (*Id*. 8.)  MiCal argues that Waldman Seafood's failure to produce the records despite its document production demands and a discovery order requiring production of the records warrant dismissal of the Complaint.  (*See generally*, Def.'s Br.)

The draconian relief MiCal seeks is unwarranted.  District courts in this circuit enjoy wide discretion to issue sanctions for a party's failure to comply with discovery orders.  *Ali v. Sims*, 788 F.2d 954, 957 (3d Cir. 1986); *Fed. R. Civ. P.* 37(b)(2).  Waldman Seafood produced the telephone and e-mail records that it had in its possession.  The evidence shows that the demanded e-mails were deleted in the normal course of Waldman Seafood's business operations.  (Pl.'s Opp. Br. 11-14.)  Additionally, MiCal deposed Waldman Seafood's information technology consultant who confirmed that Waldman's computer's hard drive crashed, which prevented Waldman Seafood from preserving the subject e-mails.  (*Id*. 2.)  Moreover, a representative of Port Royale submitted a certification confirming that Port Royale and Waldman Seafood had entered into the back-to-back contract.  MiCal was free to subpoena Port Royale's records or depose the Port Royale representative to further solicit information regarding the back-to-back contract.  Furthermore, MiCal's assertion that the Port Royale contract is essential to Waldman Seafood's proof of damages is unavailing as Waldman Seafood can establish damages even in the absence of the Port Royale contract.  Indeed, the undisputed evidence demonstrates that Waldman Seafood is a

"volume seller with virtually unlimited ability to sell tuna to its numerous customers."  (SUF ¶ 16.)  Therefore, MiCal's motion to dismiss is denied.

IV.    **CONCLUSION**

In conclusion, the evidence of record shows that Waldman Seafood and MiCal had a contract for the sale of specified tuna; MiCal breached the contract by its failure to furnish the specified tuna; and Waldman Seafood suffered damages as a result of MiCal's breach.  Therefore, this Court **GRANTS** Waldman Seafood and Waldman's summary judgment motion.  MiCal's counterclaims are **DISMISSED**.  Further, MiCal's motion to dismiss is **DENIED**.

s/ Susan D. Wigenton, U.S.D.J.

Orig:    Clerk
Cc       Madeline Cox Arleo, U.S.M.J.
         Parties

16